UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | NO. 5:19-CR-55-DCR-MAS |
| MIKHY FARRERA-BROCHEZ, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |
| ) | |

**REPORT & RECOMMENDATION**

The Court, on referral from Chief Judge Reeves, considers reported violations of supervised release conditions by Defendant Mikhy Farrera-Brochez ("Farrera-Brochez"). [DE 125]. Considering the entire record, including Farrera-Brochez's history on supervised release, the testimony, evidence, proffer, and allocution at the revocation hearing, the Court recommends the District Court revoke Farrera-Brochez' supervised release and sentence him to a term of nine months incarceration and with no supervision to follow.

    **I.   CASE BACKGROUND**

On September 27, 2019, United States Chief District Judge Danny C. Reeves sentenced Farrera-Brochez to a 24-month term of imprisonment followed by a 3-year term of supervised release after a jury convicted him of two counts of transmitting threatening interstate communications with an intent to extort and one count of possession and transfer of a means of identification in violation of 18 U.S.C. § 875(d) and 18 U.S.C. § 1028(a)(7) & (b)(2)(B),

respectively.[1]  [DE 33 and 59].  The Court imposed mandatory, standard, and special conditions of release.  [DE 59].  The special conditions prohibited Farrera-Brochez from possessing or using an Internet-capable device without prior approval, from sending threatening, harassing, or intimidating communications, and from contacting his mother, Theresa King.  At the request of the United States Probation Office ("USPO"), and with the consent of Farrera-Brochez, the Court modified the special conditions to include a requirement that Farrera-Brochez reside in a halfway house for 180 days upon his release from prison.  USPO requested the modification because "[t]he inmate has no stable residence to release to and some mental health issues . . . [residing in a halfway house] will allow the Probation Office to provide some stability and allow us to set up mental health treatment services for the defendant."  [DE 78 at Page ID # 728].

## II.   SUPERVISED RELEASE HISTORY

Farrera-Brochez began his original term of supervision on December 28, 2020, as a resident of Dismas Charities Halfway House.  On February 2, 2021, USPO notified the Court that while at Farrera-Brochez refused submit to a urinalysis at Dismas on January 31, 2021.  Farrera-Brochez also refused to do his assigned work detail at Dismas.  Dismas consequently removed him from the program on February 1, 2021.

At Farrera-Brochez's scheduled initial appearance on the February 2021 supervised release violations, Farrera-Brochez stated he did not wish to be represented by his appointed standby counsel, Philip Lawson.  Mr. Lawson had not previously represented Farrera-Brochez.  Prior to appointment or the Rule 32.1 hearing, Mr. Lawson moved for a mental health evaluation of Farrera-Brochez. The Court granted the request. [DE 81].  While Farrera-Brochez was undergoing

---

[1] The conduct that led to the conviction involved Farrera-Brochez stealing a registry listing HIV-positive individuals from the Singaporean government, leaking it to the press, and attempting to use it as leverage to get his husband released from a Singaporean government custody.  [DE 1].

the mental competency examination, he moved the Court *pro se* to remove Mr. Lawson as his counsel and for a detention hearing. [DE 84, 85, and 86]. The Court held a status conference, at which time the Court officially appointed Mr. Lawson to represent Farrera-Brochez and denied Farrera-Brochez's requests because his competency had not yet been determined. [DE 90].

The Court conducted a final competency hearing on May 13, 2021. The parties stipulated to the accuracy of the competency report and the Court found Farrera-Brochez competent to proceed in this matter. [DE 97]. Upon the finding of competency, and at Farrera-Brochez's request, the Court conducted a *Farretta* colloquy and held that Farrera-Brochez voluntarily waived his right to counsel. The Court warned him of the risks of proceeding without counsel, and Farrera-Brochez indicated that he wanted to represent himself going forward. The Court then conducted the initial appearance on the February 2021 violations and found probable cause.

On June 3, 2021, Chief Judge Reeves found Farrera-Brochez had violated the terms of his supervision.[2] He revoked Farrera-Brochez's supervised released and sentenced him to a term of imprisonment of seven months, followed by twenty-nine months of supervised release. [DE 103].

### III. THE INSTANT VIOLATIONS

Farrera-Brochez began his current term of supervised release on September 4, 2021. USPO issued a Supervised Release Violation Report ("Report") on November 22, 2021 alleging that Farrera-Brochez had violated his special conditions by (1) possessing and using a smart phone (2)

---

[2] Mr. Lawson was once again present as appointed standby counsel in case Farrera-Brochez decided he no longer wished to proceed *pro se*. At the hearing, Farrera-Brochez engaged in numerous outbursts that included threats against the United States Deputy Marshals in the courtroom. Chief Judge Reeves specifically noted that he did not take Farrera-Brochez's courtroom behavior into account in determining the appropriate term of incarceration, but that he did take into account that the competency report indicated Farrera-Brochez suffered from certain mental ailments that made further residency in a halfway house unlikely to be fruitful and could endanger the other individuals and staff there. [DE 109 at Page ID 904-5].

to send a threatening, harassing, or intimidating message (2) to Theresa King. [*See* Report, Violations 1-3, respectively].

The Court conducted an initial appearance on the instant supervised release violations pursuant to Rule 32.1 on December 2, 2021. [DE 128]. The Court advised Farrera-Brochez of his constitutional rights, including his right to counsel, and provided standby counsel for him. Farrera-Brochez again waived his right to counsel and stated he wished to proceed *pro se*. The Court conducted a preliminary hearing pursuant to Rule 32.1. During the preliminary hearing, Farrera-Brochez had an outburst, requiring the United States Marshal Service to intervene and remove Farrera-Brochez from the courtroom. The Court determined the hearing could not continue with Farrera-Brochez in the courtroom due to his repeated disruptive behavior. The Court proceeded without Farrera-Brochez in the courtroom and found that there was probable cause to believe that Farrrera-Brochez had violated the terms and conditions of his supervised release. [DE 128]. The Court further found Farrera-Brochez did not prove by clear and convincing evidence that he would not pose a danger or risk of flight in the interim, and detained him until the final hearing.

At the final hearing on December 13, 2021, Farrera-Brochez contested all three violations. The burden was on the United States to prove by a preponderance of the evidence that Farrera-Brochez violated the terms of his supervision. The United States introduced the testimony of United States Probation Officer Tony Gilkey and a screenshot of the text message Ms. King received. [DE 133]. Farrera-Brochez cross-examined Officer Gilkey and introduced his own exhibits.

Officer Gilkey testified in conformity with the Report. He stated he received information from the United States Attorney's Office that Farrera-Brochez had contacted Ms. King via text message to her niece from an unknown phone number ending in 5688. Officer Gilkey read the

4

screenshot of the text message into the record. The message stated: "This has gone on long enough Ms. King. You've caused Mikhy enough trouble. Please return his property. Our next step will be to discuss things with Teledyne Brown and Mr. Sims." [DE 133]. Ms. King is engaged to an individual named Bret Sims whose employer is Teledyne Brown.

Officer Gilkey testified that he made personal contact with Farrera-Brochez to determine whether he possessed the device that sent the above text message. Officer Gilkey testified he observed Farrera-Brochez holding an Internet-capable smart phone. Officer Gilkey called the number ending in 5688 and the smart phone in Farrera-Brochez's hand rang. Officer Gilkey testified he had not provided Farrera-Brochez with written permission to possess that smart phone.

As to the second and third violations, Officer Gilkey testified that Ms. King's niece received the text message and passed it along to her. Officer Gilkey stated he knew that the message caused Ms. King distress. Officer Gilkey testified on cross-examination that he believed the message to be harassing or threatening.

Farrera-Brochez contested the violations through cross-examination of Officer Gilkey, argument, and proffer. Farrera-Brochez's arguments, though rambling and difficult to parse, amounted to contesting that the phone Officer Gilkey found him with was not the phone he regularly used or possessed. Farrera-Brochez argued that he possessed a different smart phone, with a different phone number, which he utilized solely to obtain employment. Farrera-Brochez argued that the prohibition on possessing a cell phone without prior USPO permission was unconstitutional. Farrera-Brochez unequivocally denied sending a text message to Ms. King, and argued that Ms. King had been harassing him via the mail. Farrera-Brochez's final argument contesting his violations was that his conditions of release prohibited him from contacting "Theresa King," but the alleged violation involved contacting "Teresa King."

## IV.  ANALYSIS

The Court has evaluated the entire record, considered the arguments presented at the final hearing, the record concerning Farrera-Brochez's violations, the presentence investigation report, and the factors set forth in 18 U.S.C. § 3583(e).

### A.  THE UNITED STATES ESTABLISHED THE VIOLATIONS WITH PREPONDERANT EVIDENCE.

Farrera-Brochez could not explain why, when Officer Gilkey called the phone number ending in 5688, the phone in his hand rang.  He merely suggested that Officer Gilkey committed perjury.  Farrera-Brochez did not dispute that the phone at issue was Internet-capable.  Further, Farrera-Brochez conceded that he did possess an Internet-capable cell phone that he used to complete an online interview process, though he maintained that it was not the phone connected the number ending in 5688.  The Court finds Farrera-Brochez's narrative implausible and Officer Gilkey's testimony to be credible.  Through the evidence and testimony in the record, as well as Mr. Farrera-Brochez's own statements, the United States proved by a preponderance of the evidence Farrera-Brochez possessed a device with Internet access without prior written approval of USPO.

Having found that the United States proved Farrera-Brochez possessed an Internet-capable cell phone, the Court easily finds the United States also proved Farrera-Brochez sent or attempted to send a threatening or harassing message to his mother, Theresa King, via text to his mother's niece.  Based on the testimony of Officer Gilkey, the Court finds that the content of the text message, particularly the statement that someone would "discuss things with Teledyne Brown," was intended to harass, threaten, or intimidate Ms. King by threatening to involve her fiancé's employer in her personal issues with Farrera-Brochez.  Officer Gilkey's testimony that he called the number that sent the text and the smart phone in Farrera-Brochez's hand rang is convincing proof that Farrera-Brochez sent the threatening and harassing message, with the intent that it reach

Ms. King. Finally, Farrera-Brochez's statements about Ms. King during the hearing laid bare his deep animosity towards her, and only further convinced the Court he sent the text message, intended it to be harassing or threatening, and intended his mother, Theresa King, to receive it.[3]

Thus, based on these facts and the testimony of Officer Gilkey, the Court finds the United States proved all three alleged violations by a preponderance of the evidence.

B.   **THE COURT RECOMMENDS A JUST AND FAIR SENTENCE.**

The parties agree that the Guidelines propose a sentence of three to nine months, with a statutory maximum of twenty-four months. *See* 18 U.S.C. § 3583(e)(3). Should Farrera-Brochez' supervised release be revoked, the Court can re-impose an additional term of supervised release of up to twenty-nine months, less any term of imprisonment imposed upon revocation. *See* 18 U.S.C. § 3583(h).

In recommending a sentence, the Court must consider the nature and circumstances of Farrera-Brochez' original conviction, the statutory factors in 18 U.S.C. § 3553 incorporated into 18 U.S.C. § 3583(e), and the Guidelines range. *See also United States v. Johnson*, 640 F.3d 195 (6th Cir. 2011). Farrera-Brochez' original conviction was for two counts of transmitting threatening interstate communications with the intent to extort things of value and one count of possession and transfer of means of identification. [DE 59]. Farrera-Brochez's criminal history is a Category I, as determined in his Presentence Investigation Report.

---

[3] The Court gives no credence to Farrera-Brochez's argument that he could not have violated Special Condition No. 14 by contacting "Teresa King" because he was only prohibited from contacting "Theresa King." This petty sophistry belies any logical or practical reading of his terms of supervision. In addition, the text message at issue was addressed to "Ms. King," not "Theresa" or "Teresa," and included details related specifically to Farrera-Brochez's mother's fiancé. Whether Farrera-Brochez's mother's first name is spelled "Teresa" or "Theresa" is immaterial under the circumstances.

Considering the factors set forth in 18 U.S.C. § 3553, it is clear to the Court that revocation is necessary at this juncture. 18 U.S.C. § 3553(a)(2)(C). Farrera-Brochez has been unwilling to abide by the terms of supervision during the very short period he has been on it.

In the original Judgment, the District Court imposed a 24-month term of imprisonment on each count of conviction, to run concurrently, followed by a 3-year term of supervised release. [DE 59]. This was the statutory maximum on each of counts 1 and 2 and above the Guidelines range of 6 to 12 months. S*ee* 18 U.S.C. § 3553(a)(6) (considering "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"); *See also*, Sentencing Tr. DE 64 at Page ID # 622 (amending Guideline from the Presentence Investigation Report based on objections); and Guidelines § 3D1.2, requiring grouping of Farrera-Brochez's offenses. The District Court noted that, in Farrera-Brochez's case, the Guidelines range was "woefully inadequate based upon the seriousness of the offenses committed by this defendant in this case. . . . [W]hen I look at the factors of 3553, that a 24-month term of incarceration is absolutely necessary to meet all of the statutory factors of 3553, which do take into account the defendant's history and his characteristics, lack of remorse, and his willingness to harm any person that – to which – to whom would disagree with him." [Sentencing Tr., DE 64 at Page ID # 654-55].

The Court seeks to craft a punishment that will reprimand Farrera-Brochez' misconduct, protect the public, and (hopefully) motivate behavioral change, but not set him up for additional failures on supervised release. 18 U.S.C. § 3553. The Court believes both Farrera-Brochez and society will benefit more from Farrera-Brochez serving a longer term of incarceration with no supervision to follow than being placed on another term of supervised release. As his behavior at each Court appearance has shown, Farrera-Brochez believes the Court, the United States

Attorney's Office, the Marshal Service, USPO, and foreign governments are involved in a conspiracy against him, and he engages in frequent outbursts to that effect. These outbursts are somewhat like the conduct that led to his original conviction.[4] This skewed worldview leads the Court to believe additional supervision will not provide any assistance to Farrera-Brochez. For example, because Farrera-Brochez was homeless when he was released from prison, USPO requested the Court add a condition that he reside in a halfway house to assist him with reentering society.[5] Farrera-Brochez refused to conform to the requirements of the halfway house, which ultimately led to his first round of supervised release violations. Upon his second release from prison, USPO again attempted to assist Farrera-Brochez find a suitable living situation at the Hope Center and obtain employment. Instead of seizing the opportunity to reintegrate and improve his circumstances, Farrera-Brochez chose to send threatening messages to his mother in violation of his conditions of release. The Court is unconvinced that a third term of supervision will be successful or serve any of the purposes listed in 18 U.S. Code § 3553 as incorporated in 18 U.S.C. § 3583.[6]

---

[4] The Court notes, once again, that Farrera-Brochez underwent a competency evaluation and was found competent to proceed in this case. [DE 97].

[5] At Farrera-Brochez's prior final revocation hearing, United States Probation Officer Donte Key testified that when Farrera-Brochez was going to be released from prison, he "reviewed his [Farrera-Brochez's] paperwork, noticed some mental health issues, noticed that he was going to be homeless, noticed some disciplinary reports within the institution, and thought that it would be best for us to start his supervision, being that he didn't have anywhere to go, with a more hands-on approach, so to speak, with him going to the RFC [halfway house]." [Tr., DE 109 at Page ID # 861].

[6] The Court, in recommending revocation without reimposition of a term of supervision, recognizes the Court will not be able to impose conditions prohibiting Farrera-Brochez from contacting his mother. However, it is the Court's understanding from USPO that Ms. King resides in another state. Should a domestic violence or harassment situation occur, those issues are typically—and more efficiently—handled in state court.

For these reasons, the Court recommends the District Court revoke Farrera-Brochez's term of supervision and sentence him to the highest end of the Guidelines range, nine months. This sentence will punish Farrera-Brochez for his continued disregard for the rule of law and the sanctity of the federal court system. The Court hopes this will deter Farrera-Brochez from committing future offenses. This period of incarceration will protect the community from Farrera-Brochez during that time. The Court further recommends that the District Court refrain from imposing a period of supervised release to follow. Farrera-Brochez already served a 24-month term of imprisonment for his original offense and a seven-month term for his first supervised release violation, in addition to any term of incarceration the District Court may impose on the instant revocation matter. Additional supervision will likely serve no rehabilitative purpose in this case and may result in Farrera-Brochez becoming stuck in a long cycle of revocation and prison sentences that are disproportionate to the penalties for his original offense conduct. See 18 U.S.C. § 3553(a)(6) ("The court, in determining the particular sentence to be imposed, shall consider—[. . .] (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]"). The Court finds this sentence is sufficient but not greater than necessary to punish and deter Farrera-Brochez's conduct in violating his supervised release.

## V.   CONCLUSION

Accordingly, for the reasons stated herein, the Court **RECOMMENDS**:

(1) Farrera-Brochez be found guilty of all violations;

(2) Farrera-Brochez' supervised release be **REVOKED**;

(3) Nine (9) months of incarceration; and

(4) No supervision to follow.

Farrera-Brochez preserved his right of allocution. Absent a waiver of allocution, this matter will be placed on Chief Judge Reeve's docket for an allocution hearing upon submission.

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this recommendation, issued under subsection (B) of the statute. *See also* 18 U.S.C. § 3401(i). As defined by § 636(b)(1), within 14 days after being served with a copy of this recommended decision, any party may serve and file written objections to any or all portions for consideration, *de novo*, by the District Court. Failure to make a timely objection consistent with the statute and rule may, and normally will, result in waiver of further appeal to or review by the District Court and Court of Appeals. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981).

Entered this 5th day of January, 2022.



Signed By:
Matthew A. Stinnett  *MAS*
United States Magistrate Judge